CLERKS OFFICE US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED
August 11, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Kayla Lokey
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| DAVID P., Plaintiff, | ) | Civil Action No. 3:25-cv-00019 |
| v. | ) | REPORT & RECOMMENDATION |
| FRANK BISIGNANO, Commissioner of Social Security, Defendant. | ) | By: Joel C. Hoppe, United States Magistrate Judge |

Plaintiff David P. asks this Court to review the Commissioner of Social Security's final decision denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. ECF No. 1. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record ("R."), ECF No. 6, the parties' briefs, ECF Nos. 13, 15, 16, and the applicable law, I find that substantial evidence does not support the denial of benefits. Accordingly, I recommend that the presiding District Judge reverse the Commissioner's decision and remand David's case under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it cannot "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence in the existing record supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d

700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). *See Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019). Substantial-evidence review considers the entire record and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, a court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## II. The Legal Framework

A person is "disabled" under the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine if a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v.*

*Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. "At step five, the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy,' considering [his or her] residual functional capacity, age, education, and work experience." *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015) (quoting 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c)(2), 416.1429); *accord* 20 C.F.R. §§ 404.1520, 404.1560, 404.929. "If the Commissioner meets [this] burden, the ALJ finds the claimant not disabled and denies the application for benefits." *Mascio*, 780 F.3d at 635.

## III. Background

David filed for DIB and SSI in July 2021. *See* R. 221, 223. He alleged that he had been disabled since June 29, 2021, because of back problems, brain injury, post-traumatic stress disorder, bipolar disorder, and obsessive-compulsive disorder. R. 259. David was 50 years old, or a "person closely approaching advanced age" under the regulations, on his alleged onset date. R. 94; *see* 20 C.F.R. §§ 404.1563(d), 416.963(d). Virginia Disability Determination Services ("DDS") denied David's claims initially in October 2021, R. 92–93, and upon reconsideration in June 2022, R. 108–09. The DDS medical experts who reviewed his records opined that he had "severe" medically determinable impairments ("MDIs") relating to the spine and osteoarthrosis, and "nonsevere" MDIs relating to depression, anxiety, and stress disorders. *See* R. 96, 122. In August 2023, David appeared with counsel and testified at a hearing before ALJ Carol Moore. *See* R. 52–84. A vocational expert ("VE") also testified. R. 85–90.

ALJ Moore issued an unfavorable decision on September 27, 2023. *See* R. 29–40. She found that David had three severe MDIs: "cervical discogenic disease and osteoarthritis, lumbar

degenerative disc disease, and migraine headaches." R. 30. His "anxiety and depression" were nonsevere MDIs because they did "not cause more than minimal limitations in [his] ability to perform basic mental work activities." R. 31. More specifically, David had "no limitation" understanding, remembering, or applying information, and only "mild" limitations interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing himself. *See* R. 31–32 (citations omitted).

At step three, ALJ Moore found that none of David's severe MDIs met or medically equaled a listed impairment. *See* R. 32–33. Her step-three analysis of David's severe migraine headaches reads in its entirety:

> Although there is no specific listing for migraine headaches, listing 11.02 is most analogous for primary headache disorders. (SSR 19-4p). However, the claimant's headaches do not manifest in the same manner as reflected in 11.02 subparts B or D.[1] Therefore, the record does not establish that the claimant's headaches equal the severity of the listing. (Ex. 9F).

[1] Primary headache disorder, which includes migraine headaches, is not a listed impairment. SSR 19-4p, 2019 WL 4169635, at *7 (Aug. 26, 2019). "Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of primary headache disorder." *Id.* "While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures)" sufficient to support a finding that the disorder is disabling because it "medically equals the listing." *Id.*; *see* 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 11.00G, 11.02B, 11.02D. Paragraphs B and D set out the medical evidence and factors ALJs consider when evaluating severe headache disorders at step three. SSR 19-4p, 2019 WL 4169635, at *7. Paragraph B "requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment." *Id.* (citing § 11.02B); *see* 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 11.00C, 11.00H, 11.02B. Paragraph D requires "dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, *and* marked limitation in one area of [physical or mental] functioning." *Id.* (citing § 11.02D) (emphasis added); *see* 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 11.00C, 11.00H, 11.00G2–3, 11.02D. "[M]arked limitation means that, due to the signs and symptoms of your neurological disorder, you are seriously limited in the ability to independently initiate, sustain, and complete work-related" physical or mental activities. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.00G2–3.

R. 33 (citing R. 860–933). ALJ Moore also discussed the medical and other evidence related to David's headaches later in her decision. *See* R. 34–37 (citing R. 67–69, 334–36, 453–56, 616, 774–76, 791–93, 866–71, 883–84, 923–27, 930–32).

ALJ Moore evaluated David's residual functional capacity ("RFC")[2] during the relevant time. *See* R. 34–38. She found that he could sustain "light work"[3] as defined in the regulations except:

> He can sit, stand, or walk no more than 30 minutes at a time, at which time he needs to change position with no loss of productivity. . . . He can tolerate occasional exposure to noise and the noise level of a work environment should be 3 or less. He can understand and recall simple instructions and use judgment to make simple work-related decisions. He can carry out simple instructions but should not perform work that requires specific production rate, such as assembly line work or work requiring hourly quotas.

R. 33. "[T]he limitations to noise as well as to simple instructions, simple decision making, and no production rate jobs accommodate for his headaches." R. 37; *accord* R. 38 ("[F]inding migraine headaches severe supports limiting his exposure to noise, as well as limiting him to simple instructions, simple workplace decisions, and no production rate pace.").

At step four, ALJ Moore found that David could not return to his past relevant work as a service manager. R. 38–39. Relying on the VE's testimony at step five, however, she found that David could transition to light, unskilled work existing in the national economy (ticket taker, cashier, non-postal mail clerk) given his RFC and vocational profile. *See* R. 39–40 (citing R. 88–89). She therefore concluded that he was not disabled from June 29, 2021, through September

---

[2] "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular continuing basis"—i.e., for "8 hours a day, 5 days a week, or an equivalent schedule." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted).

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983).

27, 2023. R. 40. The Appeals Council declined to review ALJ Moore's decision, R. 1–4, and this civil action followed.

IV. Discussion

David makes two arguments. *See* Pl.'s Br. 17–20, 24–26. First, he argues that ALJ Moore's conclusory listings analysis does not comply with SSR 19-4p, and that her decision as a whole did not discuss specific medical records showing that David's headaches occurred "at least once a week for at least 3 consecutive months despite adherence to treatment[] consistent with Listing 11.02(B)."[4] *Id.* at 20. Second, he argues that ALJ Moore did not consider a DDS psychologist's medical opinion about David's nonsevere mental MDIs, which the regulations expressly require her to do. *See id.* at 24–26 (citing R. 122). David's first argument is persuasive.

*

David must be found conclusively "disabled" at step three if he produces evidence from an acceptable medical source ("AMS") showing that his severe MDI of migraine headaches "is equal in severity and duration to the criteria in Listing 11.02B," SSR 19-4p, 2019 WL 4169635, at *7. *See generally Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013); 20 C.F.R. §§ 404.1520(d), 416.920(d). Listing 11.02B "requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment." SSR 19-4p, 2019 WL 4169635, at *7; *see also* 20 C.F.R. pt. 404, subpt P, app. 1 § 11.00H4d ("We do not count seizures that occur during a period when you

[4] David also argues that his recurrent headaches could be found to cause a "marked limitation" in one of the functional areas consistent with Listing 11.02D. *See* Pl.'s Br. 20, 24–26 (citing R. 122, 774, 923, 932). This objection "incorporates the arguments for" his second objection that ALJ Moore failed to consider the persuasiveness of a DDS phycologist's medical opinion that David's nonsevere mental MDIs caused "mild" limitations in the same broad functional areas. *Id.* at 20. ALJ Moore's failure to properly analyze David's severe headache disorder under SSR 19-4p and Listing 11.02B requires reversal and remand in this case. *See, e.g.*, *Howington v. Kijakazi*, No. 2:21cv3648, 2023 WL 12201546, at *6, *8 (D.S.C. Mar. 20, 2023). Accordingly, I do not discuss David's objection under Listing 11.02D.

are not adhering to prescribed treatment without good reason.”). Thus, ALJ Moore needed to evaluate whether the evidence established that David had headaches “at least once a week for at least 3 consecutive months” despite following “prescribed treatment,” SSR 19-4p, 2019 WL 4169635, at *7. *See Howington*, 2023 WL 12201546, at *6; *cf. Cook v. Howard*, 783 F.2d 1168, 1173 (4th Cir. 1986) (“The ALJ should have identified the relevant listed impairments. He then should have compared each of the listed criteria to the evidence of Cook’s symptoms.”). SSR 19-4p required her to “consider”:

> A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment . . . ; and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day. . . .

SSR 19-4p, 2019 WL 4169635, at *7; *see, e.g.*, *Troy D. v. Dudek*, No. 1:23cv1023, 2025 WL 6065929, at *10 (M.D.N.C. Feb. 25, 2025) (quoting SSR 19-4p). David’s treatment records contain several such statements. *See Howington*, 2023 WL 12201546, at *7–8. In March 2022, for example, a physician noted that David’s “chronic” headaches were “increasing in frequency with some migrainous qualities” including “sensitivity to light/sound.” R. 776. David endorsed “daily headaches” at this visit. R. 774. Eleven months later, another physician noted that David had suffered from chronic headaches for “years” despite his adherence to “multiple medication regimens.” *See* R. 844 (Feb. 7, 2023).

ALJ Moore did not consider these factors at step three. R. 33; *see Howington*, 2023 WL 12201546, at *6. Her analysis references SSR 19-4p, but states only that David’s “headaches do not manifest in the manner as reflected in 11.02[B].” R. 33 (citing R. 860–933). It identifies no evidence in the cited exhibit to support this conclusion. *See Howington*, 2023 WL 12201546, at *5–6; *cf. Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (“[T]he ALJ must *both* identify

evidence that supports his conclusion *and* build an accurate and logical bridge from that evidence to his conclusion." (cleaned up)). Moreover, the governing legal standard instructs that a claimant's severe primary headache disorder (including migraines) will be found disabling at step three when it "manifests" in a specified "manner"— i.e., when the headache events occur (i) at least once a week (ii) for at least three consecutive months (iii) despite his adherence to prescribed treatment. SSR 19-4p, 2019 WL 4169635, at *7 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02B). ALJ Moore's decision does not acknowledge this standard. R. 33; *cf. Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 385 (4th Cir. 2021) (reversing and remanding in part because "the ALJ never so much as acknowledged the existence" of the governing legal standard). Thus, even assuming she applied the correct legal standard at step three, her analysis does not explain why she apparently concluded that David's migraine disorder failed to satisfy at least one of its three specific criteria. R. 33; *see Zebley*, 493 U.S. at 530 ("For a claimant to qualify for benefits by showing that his unlisted impairment . . . is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment."). Such a conclusory analysis fails as a matter of law. *See, e.g.*, *Radford*, 734 F.3d at 295; *Cook*, 783 F.2d at 1173; *Howington*, 2023 WL 12201546, at *6 (applying SSR 19-4p).

Even so, "[w]e must read the ALJ's decision as a whole." *Keene v. Berryhill*, 732 F. App'x 177 (4th Cir. 2018). The Fourth Circuit has upheld a deficient step-three conclusion "based on the ALJ's findings at subsequent steps in the [disability] analysis." *Id.*; *see also Smith v. Astrue*, 475 F. App'x 326, 328 (4th Cir. 2011). ALJ Moore did consider the frequency and duration of David's headaches, as well as his adherence to treatment, later in her decision. *See* R. 34–37 (citations omitted). In August 2023, for example, David testified that he fractured his skull

in June 2021 and "he continues to have headaches and migraines. . . . [H]e takes medication that improves his headaches but he cannot leave the house. He reported having headaches four times a week that are so severe that he has to go to bed." *See* R. 34 (citing R. 67–69). ALJ Moore found that David's headaches "waxed and waned" in 2021–2023, but concluded that "[t]he record does not support that he has consistently had migraines at the frequency he testified to at the hearing." R. 37 (citing R. 67–69). She also concluded that "[t]he record . . . documents some noncompliance with the recommendation to decrease[] Excedrin in August 2022." *Id.* (citing R. 927). I explain below why ALJ Moore's failure to explain how she reached these conclusions precludes meaningful judicial review. *See Howington* 2023 WL 12201546, at *7–8. Further, ALJ Moore's conclusion that "the record" did not show that David "consistently" had migraines "four times a week," R. 34, 37, says nothing about whether his physicians described a typical headache event "occurring at least once a week for at least 3 consecutive months despite [his] adherence to prescribed treatment," SSR 19-4p, 2019 WL 4169635, at *7. *Cf. Fortner v. Saul*, No. 9:19cv76, 2020 WL 532969, at *3 (D.S.C. Jan. 15, 2020) (recommending reversal where "the ALJ failed to make a finding as to the frequency of Plaintiff's migraines, stating only that 'the record does not support the claimant's allegation that her migraines last for several days'"), *adopted*, 2020 WL 528174 (D.S.C. Feb. 3, 2020). "A full explanation by the ALJ is particularly important in this case because [David's] medical record includes a fair amount of evidence," *Radford*, 734 F.3d at 295, that his severe headache disorder satisfies this standard. *See, e.g.*, R. 334–35, 337, 774, 776, 791, 860, 865 923, 927, 930.

**

David's allegedly disabling headaches began when he sustained a traumatic head injury in June 2021. *See* R. 860, 927. Physicians with UVA's Family Medicine clinic followed this chronic condition from July 2021 through at least April 2023. On July 14, 2021, David reported

"baseline migraines" with associated aura, vertigo, "phono- and photo-sensitivity," that "come and go throughout the day." *See* R. 334–35, 337. Jeremy Kent, M.D., prescribed "a short course of tramadol with plan to transition to amitriptyline." R. 336. On July 28, David told Dr. Kent that his headaches "completely resolved. He [was] no longer taking any pain medications or his amitriptyline." R. 453.

By March 2022, David's chronic "daily" migraine headaches had returned. R. 774; *see* R. 776. These "headaches [were] bilateral/throbbing in nature" with "sensitivity to light/sound" and "nausea/vomiting." R. 774. Mateen Manshadi, M.D., restarted 25mg amitriptyline (Elavil) once daily for migraine prophylaxis. R. 776. That May, David reported that the amitriptyline "helped reduce[] the severity but not the frequency of his headaches." R. 791 (May 5, 2022). In August, he still had headaches "every day" despite taking the 25mg Elvail plus over-the-counter Excedrin "3–4x per day." R. 930 (Aug. 29, 2022). Greg Turissini, D.O., increased the Elavil to 50mg daily and "advised to decrease [Excedrin] use, as this may be driving rebound-headaches." R. 932. In November, David told Evelyn Bodenschatz, M.D., that 50mg amitriptyline "mildly improved his symptoms, but he still ha[d] daily multiple lower migraines that resolved only with sleep." R. 923 (Nov. 4, 2022). David also still took OTC Excedrin, but he did not say if he had decreased his usage per Dr. Turissini's recommendation. *See* R. 925–27. Dr. Bodenschatz noted David's "headaches ha[d] been going on since he had a traumatic injury many years ago" and "multiple medication regimens" produced only "minimal improvement." R. 927. "He had been told to discontinue his Excedrin use at his last visit . . . but has not done so." R. 927. *But see* R. 932. Dr. Bodenschatz told David to stop Excedrin and continue 50mg Elavil. R. 927; *see* R. 883.

In February 2023, David told Dr. Turissini that he was "doing well" on 50mg Elavil and decreased reliance on Excedrin. R. 883 (Feb. 7, 2023). Nothing suggests that David reported a

specific frequency of headache events at this visit. *See* R. 884 ("These HAs have been going on since he had a traumatic injury years ago and has had minimal improvement with multiple medication regimens. However, he is doing well at his current dose of Elavil."). By April, however, David reported migraine headaches occurring "about 4 times per week" despite taking amitriptyline. R. 860 (Apr. 14, 2023). He stopped Excedrin, which ruled out concern for "medication overuse headache." *Id.* David described these headaches as "10/10 bifrontal severe throbbing or aching pain associated with photophobia and phonophobia." *Id.* He did not know "if the amitriptyline had any effect." *See* R. 865. Matthew Rumschlag, M.D., prescribed Depakote and Rizatriptan. *Id.* In August 2023, David testified he had "headaches four times a week that are so severe that he has to go to bed." R. 34 (citing R. 68–69). "[T]here's no leaving the house" once David takes his migraine medication. R. 68. "That's strong medicine." *Id.*

ALJ Moore discussed this evidence in her decision. R. 34–37 (citing R. 67–69, 334–36, 453–56, 616, 774–76, 791–93, 866–71, 883–84, 923–27, 930–32). To her, it established that

> [David's] headaches have waxed and waned, with resolution reported in July 2021, but a return of complaints in March 2022; some improvement with medication in May and November 2022; a report of doing well on his current dose of medication in February 2023; and a report of four migraines a week in April 2023.

R. 37. Yet, she also concluded "[t]he record does not support that [David] has consistently had migraine headaches at the frequency he testified to the hearing"—i.e., "four times a week." *Id.* ALJ Moore did not cite specific parts of "the record" to support her conclusion. *See Radford*, 735 F.3d at 295. Further, ALJ Moore had just summarized medical records showing that David told his physicians in May, August, and November 2022 he was having "daily" migraine headache events despite taking Elavil as prescribed. *See* R. 791, 923, 930–32. David consistently endorsed nausea, vomiting, and/or sensitivity to light and sound, as well as severe headache pain that woke him up at night. *See* R. 334–35, 776, 791–93, 860, 865, 930–32. In February 2023, Dr. Turissini

said these headaches started "years ago" and had "minimal improvement" despite David trying "multiple medication regimens," even though he was "doing well" on 50mg Elavil at that time. R. 884. In April, David reported having migraines "about 4 times per week" with 50mg Elavil. R. 860. Dr. Rumschlag added Depakote and Rizatriptan because the migraines were "getting more frequent." *See* R. 860, 865. These records contain probative medical-source evidence suggesting that David's severe headache disorder equals the severity and duration of the criteria in Listing 11.02B. *See, e.g.*, *Howington*, 2023 WL 12201546, at *7–8 (applying SSR 19-4p). ALJ Moore's failure to explain how she considered them—as well as her failure to determine explicitly whether David's medical records document a typical headache occurring at least once a week for at least three consecutive months—precludes meaningful judicial review.[5] *See id.*

ALJ Moore also concluded that David's record "documents some noncompliance with the recommendation to decrease[] Excedrin in August 2022. When he did report decreased use of Excedrin in February 2023, he reported doing well on his other medications." *Id.* (citing R. 927, 883). The ALJ's reliance "on these limited observations" to discount the medical severity of David's headache disorder improperly "seizes on insignificant inconsistencies in the treatment record while overlooking the record's broader import," *Testamark v. Berryhill*, 736 F. App'x 395, 399 (4th Cir. 2018). To start, SSR 19-4p requires ALJs to consider medical-source evidence about the claimant's "adherence to *prescribed* treatment" in determining whether the record establishes the requisite number and duration of headache events "despite [his] adherence to *prescribed* treatment." SSR 19-4p, 2019 WL 4169635, at *7 (emphasis added). David's doctors prescribed Elavil for headaches in 2022–2023, and the medical record contains ample evidence

[5] Her unexplained conclusion that "the record does not support" a finding that David "has consistently had migraines" at least *four* times a week, *see* R. 34, 37, does not answer this potentially dispositive question. *See Fortner*, 2020 WL 532969, at *3.

that David had several headaches a week despite taking that drug as prescribed. *See, e.g.*, R. 791, 884, 860, 923, 930–32. ALJ Moore referenced this evidence, but her "otherwise perfunctory discussion" of David's headache disorder does not explain how she considered any of it. *Fortner*, 2020 WL 532969, at *4; *see also Radford*, 735 F.3d at 295.

Further, the progress note cited by the ALJ does not show that David failed to "decrease" OTC Excedrin usage as Dr. Turissini's had encouraged him to do in August 2022. *See* R. 923–27 (Nov. 2022). David was taking Excedrin "3–4x per day" at that time. R. 930 (Aug. 29, 2022). The cited progress note does show David was "taking" Excedrin in November 2022, but it says nothing about how often he still did so. *See* R. 925, 927. Thus, it does not support ALJ Moore's conclusion that David exhibited "some noncompliance with" Dr. Turissini's advice for a few months in 2022. *Cf. Hines*, 453 F.3d at 565 ("This conclusion was not supported by substantial evidence because the record, when read as a whole, reveals no inconsistency between the two."). Even if David was slow to cut Excedrin, ALJ Moore acknowledged that the reported benefit was short lived. R. 37; *cf. Howington* 2023 WL 12201546, at *8 (ALJ's finding that plaintiff's migraines were controlled with medication was not supported by substantial evidence because the ALJ cherry-picked facts from the record and did not discuss medical-source evidence "that the medication stopped working and her symptoms got worse"). In April 2023, David reported having four migraines a week despite taking 50mg Elavil as prescribed. *See* R. 860. He had stopped taking OTC Excedrin, which ruled out concern for "medication overuse headache." *Id.* Dr. Rumschlag prescribed two more medications because David's migraines were "getting more frequent." *See* R. 860, 865. In sum, ALJ Moore's decision as a whole shows that she "failed to properly consider the frequency and severity of [David's] migraine impairment under Listing 11.02[B]." *Howington* 2023 WL 12201546, at *8 (applying SSR 19-4p).

## V. Conclusion

For the foregoing reasons, I find that substantial evidence does not support the Commissioner's final decision, and I respectfully recommend that the presiding District Judge **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 11, 2026

Joel C. Hoppe
United States Magistrate Judge